KINGSBERRY MORTGAGE CO. *v.* MADDOX ET AL.

[Cite as Kingsberry Mortgage Co. v. Maddox, 13 Ohio Misc. 98.]

(Nos. 35842 and 35843—Decided January 15, 1968.)

Court of Common Pleas of Clermont County.

*Messrs. West, West & Yelton,* for plaintiff.
*Mr. Richard Valleau,* for second mortgagee.
*Mr. Chris Rosenhoffer,* for lien holder.

NICHOLS, J. This matter came on before the court for hearing and the question of determination of priorities of three liens. The two cases were tried together inasmuch as the facts are identical, with the exception of the amounts of the respective mortgages or liens, and some differences in the date of filing and of making distribution.

The essential facts were submitted by stipulation of the parties, which in substance, states that the defendant, Ruth D. Wright, sold to Nathaniel Maddox and Rose Maddox the two lots in question. These deeds were dated September 9, 1966, and recorded in Deed Book 448, page 14 and 448, page 16, respectively, on the same date. The Maddox gave mortgages to the plaintiff, the Kingsberry Mortgage Company for the sum of $13,650.00 on Lot No. 59 and which was filed for record on September 9, 1966, and recorded in Mortgage Book 360, page 202, and the Mortgage on Lot No. 60, for the sum of $17,250.00 was filed on September 9, 1966, and recorded in Mortgage Book 340, page 201. Thereafter, mortgages by the Maddox were given to the defendant, R. D. Wright, who is the same person as Ruth D. Wright, each for $3,000.00 and both filed for record on September 12, 1966, and recorded in Mortgage Book 340, page 233, and Mortgage Book 340, page 235, respectively. Thereafter, on March 21, 1967, the defendant, J. H. Neff, doing business as the J. H. Neff Plumbing Company, filed his affidavit for mechanic's lien for the installation of plumbing in each of the two buildings. The amount claimed is $2,000.00, $1,000.00 on each lot. This affidavit was recorded in Lien Record 7, at page 239.

Various instruments were admitted in evidence, and the court is considering the documents actually submitted. This, likewise, was by stipulation and agreement of the parties. It was stipulated that Ruth D. Wright was the owner of the two lots in question at the time that she conveyed them to the Maddox, and it was also stipulated that at the time of the execution and filing of the deeds and mortgages, that no work was done on the premises, and that no work was apparent on the premises at that time.

In other words, it was agreed that the mortgages were filed prior to the commencement of any work on the property.

It was further stipulated and testified to that the work of Mr. Neff, as a plumber, started on January 17, 1967, finished on February 7, 1967, and the testimony, without dispute, showed that the actual work of construction on each of the lots was made prior to the payment by the plaintiff of the monies advanced to the Kingsberry Homes in payment for the package of prefabricated houses that were erected on the two lots.

The payments and checks admitted in evidence, which were payable to the Kingsberry Homes are as follows: Check dated October 17, 1966, for $3,832.94 for the package house on Lot No. 59. Check dated December 14, 1966, for $5,787.02 for the package deal on Lot No. 60, Lot No. 59 being the property described in case number 35843 and Lot No. 60 being the property described in case number 35842.

It further developed in the testimony and was admitted by the representative of the plaintiff that the mortgages were construction loans, even though they were filed prior to the date of the first construction and there was admitted in evidence a construction loan commitment in each of the cases, which in substance, provided for four advancements: one to the Kingsberry Homes Corporation at the time the package deal was delivered to the property; second payment to be made at the time the house was under roof "and the building dried in and rough utilities installed." These were admittedly the only two advances made by the mortgagor, and according to the form, represented as 60% of the total mortgage.

It also developed in the testimony that Gene, whose full name was Eugene C. Wright, was the husband of Ruth D. Wright, also known as R. D. Wright, and that he transacted all of the business in connection with the purchase of the lots by Mrs. Wright from the Bee's, and the sale of the property to the Maddox, and that he also

was the party who furnished the certificate stating that the properties were under roof.

It was submitted in argument, both by written memorandum and oral argument that the cases of *Wayne Building & Loan* v. *Yarborough*, 11 Ohio St. 2d 195 and 11 Ohio St. 2d 224, are determinative of the issues in this case, and it is claimed by the attorneys for Mrs. Wright that by virtue of this decision, her claim is the first claim against any funds derived from the sale of this property.

It is admitted that the buildings have never been completed; that the defendants Maddox are bankrupt, and that there will be, in all probability, a loss to some of the lien holders, and it, seemingly, is apparent that the buildings in their present condition will not be sufficient to pay off all of the three liens.

The question of priority of liens as between the various lien holders and mortgagees, particularly those mortgages that were filed after the commencement of the building, have created a great problem within the state of Ohio, and the courts have made various types of decisions trying to determine which, under various circumstances, would have priority.

Section 5301.23, Revised Code, provides that all mortgages properly executed shall be recorded in the office of the county recorder of the county in which the mortgage premises are situated, and take effect from the time they are delivered to such recorder for record. This is a clear and unambiguous enactment of the Legislature, stating that a mortgage lien shall be effective as of the date of the filing for record.

The problem develops where mortgages are filed after the commencement of the first work on the property as the mechanic's lien law provides that all properly filed liens shall date back to the date of the first commencement of work on the building, and therefore, that would predate the lien of the mortgage filed after the commencement of the work.

This created a problem as the mortgage companies

would not make loans after buildings had been started as the lien holders could come in and claim priority over them. There was then enacted the construction loan law, which in substance, provided that the mortgage lien would predate the time of filing and would come ahead of the mechanic's liens, provided it was paid out in certain specified ways, it being Subsection A through G of Section 1311.14, Revised Code.

Here again, the statement of the Legislature is clear, unequivocal and positive, and provides the only way in which a construction loan may pay out money and still be protected against liens. The mortgage companies, however, seemingly saw fit to disregard the plain provisions of the construction loan statutes and make distribution on what they term "draws," first, second, third and fourth draw, and allocated a certain percentage of the mortgage loan to be withdrawn in accordance with the total amount of work done on the building. The parties who had actually done the work were required to submit affidavits similar to those required in the mechanic's lien law to be submitted to the owner and payments were made on them. Only in these instances, however, the material men or the labor, or the subcontractor were told the exact amount that they were entitled to under each draw, and that in many instances had no correlation between the amount actually due. The mortgage company, seemingly, says that unless we make distribution this way, the builders will not borrow from us, and the material men and suppliers, subcontractors stated that they had to make such affidavits irrespective as to the actual amount due, or they could no longer get work to do.

As a result, there are some cases which hold that so long as the money from the construction loan was used in the construction of the house, it was sufficient to give the loan company that priority. This certainly, however, is not in conformity with the statute. It is not in conformity with the avowed purpose of the mechanic's lien law, and the construction loan law, which was an attempt to give

equal priority to all people furnishing material or doing labor on the building, as where the loan companies are permitted to make distribution to anyone who does work on a building, would mean that the persons that furnish the material for the basement, the subfloor, and did that type of work on the building, would be paid in full, wherein if there is a deficiency, the person that put on the roof, the finishing carpenter, and plumbing work, would get nothing, even though the law says specifically that their claim is equal priority to the first person doing the labor. This was one of the findings of the Supreme Court in the cases of *Wayne Building & Loan Company* v. *Yarborough, supra.*

The court in that case, stated that the building and loan would obtain priority if one of three things developed: one, that the lending institution was required unequivocally to advance all of the money agreed to in the loan, or if it had an option, the money was used in the construction of the building, or it was distributed in accordance with the provisions of the construction loan law.

The *Wayne* v. *Yarborough case*, also referred to and approved the findings of the case of *Bercaw* v. *Cockrell* (1870), 20 Ohio St. 143, to the effect that a mortgage contained a provision that the property was "free, clear and unencumbered, except a mortgage interest of I. I. Palmer this day perfected, amount $1,000.00" would not necessarily make that a second mortgage. In that case, the first mortgage was not recorded until after the filing of the second mortgage. There was some question raised in the *Wayne* v. *Yarborough case*, in respect to the filing of the two mortgages, the building and loan mortgage being filed on November 1st. It, of course, commenced on November 21st and on December 11th the land seller filed his mortgage and thereafter on the same date the deed to the property owner was filed for record and the building and loan mortgage refiled, and the case held that under those circumstances, the land owner mortgage came ahead of the building and loan mortgage.

In the case at bar, the plaintiff made further distributions after the start of the work and after the payment for the building package was delivered, and placed upon the land. In Lot No. 59 a check to Nathaniel Maddox and Rose Maddox, the M & J Construction Company, which actually was the Maddox, in the amount of $4,357.06. This check was dated October 27, 1966, and was given on a certificate signed by Gene Wright that the property was under roof and roughed in. This certificate was dated October 26, 1966.

In regard to the distribution on Lot No. 60, the check was to Nathaniel Maddox and Ruth Maddox, and the M & J Construction Company, which is in the amount of $4,562.98, and was dated January 6, 1967, and was after a certificate signed by E. C. Wright that the property was under roof and roughed in.

One other factual matter before the court can arrive at the actual decision is the provision of the so-called commitment of the Kingsberry Mortgage Company made to the borrower Maddox which provided for distribution of the proceeds of the loan. In Paragraph 5, it is provided that "the proceeds of this loan shall be advanced by lender or lender's duly appointed agent, to borrower in installments *within lender's discretion* on the following schedule." Then it provides for the first advance when the house package arrived, and second, the balance of 60% of the loan on a certificate of being roofed in. It will therefore be seen that (1) there was no definite commitment on behalf of the plaintiff to make distribution of the loan as it remained in their discretion. The court feels that it is obligated to follow the rules of the Supreme Court in the *Wayne* v. *Yarborough case*, to the extent that it is applicable to the facts in this case, even though he might personally disagree with their ruling.

The court will, therefore, find that the plaintiff had made advances of money used in the construction of the building located on the premises and therefore would have a first lien to the extent of $3,832.94 on Lot No. 59, and in

the amount of $5,787.02 on Lot No. 60. The court will, therefore, find, however, that the distribution of the balance of the money by the plaintiff, namely, $4,357.06 on Lot No. 59 and $4,562.98 on Lot No. 60 where it was not made in conformity to the provisions set out in the *Wayne* v. *Yarborough case*, and therefore, does not rate the first priority.

The court coming on to determine the priorities of liens to any funds that might be derived from the sale of the respective pieces of real estate, over and above the taxes, costs and the amount allocated to the plaintiff as being a first lien, must be determined on an entirely different basis. We come to the situation that the mortgage of Wright's which was filed prior to the start of construction, would be ahead of the Neff Plumbing Company lien, which dates back to the date of first construction. The Neff lien would be ahead of the balance due on the Kingsberry Mortgage Company, by virtue of the ruling in the *Wayne* v. *Yarborough case.*

In respect to the priorities between the plaintiff and the Wright mortgage, the Wright mortgage contains the following provision: "This mortgage deed is second and subordinate to a mortgage deed of even date from the grantors herein to the Kingsberry Mortgage Company in the principal amount of $13,650.00;" a similar provision to Lot No. 60, with exception that the amount given was $17,250.00. Likewise, this mortgage was filed for record after the date of the Kingsberry Mortgage, and would definitely not come in the provisions of the finding of the Supreme Court in the case of *Bercaw* v. *Cockrell*, 20 Ohio St. 163.

We are then met with the apparently unusual situation known as circuity of liens. The court has had no practical experience in this matter, but does have recollection of the problem presented at the time he attended law school, namely, A is ahead of B, B is ahead of C, and C is ahead of A. How do we distribute the proceeds when there is sufficient to pay all of them?

There is a very interesting, although to this court, somewhat confusing article on this subject, written by Mr. Charles C. White, Title Officer of the Land Title Abstract and Trust Company of Cleveland, Ohio, entitled "A Problem of Priorities" and being the one reported in 25 Ohio Law Reporter, commencing at page 116. This outlines the development of the question of circuity of liens and criticizes the case of *Day* v. *Munson*, 14 Ohio St. 488. This court agrees wholeheartedly with the criticism as it creates such an unnatural result. For instance, in the schedule shown at page 120 of this article, which goes on the assumption of three liens, A, B and C, each of $5,000.00, and if the fund is only $5,000.00 it all goes to A, but if the fund gets larger, up to a total of $10,000.00, A would get nothing, and B and C would each get $5,000.00, so if A would attempt to protect his lien by bidding the asset up, he would lose money, so this result is certainly not practical, and in the opinion of this court, is not based on sound reasoning.

The other outline on the same page follows a ruling set forth by the New York Court in the case of *Bacon* v. *VanSchoonhoven*, 26 N. Y. (19 Hun) 158. This has equally interesting results and is based upon the same assumption of each of the parties having a $5,000.00 lien. In this case, however, if the fund is $5,000.00 C gets it all, and as a matter of fact, gets it all clear up to $15,000.00. The court would imagine the problem of a lawyer representing B, who has a prior claim to that of C, and asking his lawyer to explain, "How was it that, even though he had a prior claim to C, C gets his full $5,000.00 and B gets nothing, even though he did have a prior lien?" There seems to be no logic to the ruling, and the only answer that the attorney could give his client was that C gets the money ahead of B, even though B has a prior claim is because some silly judge said so.

There is another quite confusing statement in the law, and that is "how do you determine which lien holder is A, which is B, and which is C?" It somewhat reminds the court of the old comedy act put on by Abbott & Costello

where they were discussing baseball players whose names were Who, How and When, along with other similar names. The question was, "Who's on first base?" and the answer is, "No, Who is on third, How is on first." This follows by when did How get on first, and how did When get on second, and creates nothing but confusion, although in the comedy vein. In this case, the confusion is still here, except I am certain the people do not feel it was funny.

The distribution in the New York case is listed as being the "common sense solution" by Mr. White, is that you first segregate the amount of A's lien and then as that eliminates B, you would distribute the segregated funds to A and C in accordance with their priorities. Certainly there is just as much reason to segregate B's lien, and then if C gets nothing, distribute between B and A, or segregate the amount of C's lien and make distribution according to the formula. It seems to me that the question of priorities, according to any of these formulas would be a matter of chance, and which formula to follow, which one to take first, might as well be determined by the turn of a card or the throw of the dice or the selection of a number.

The court feels that there is no method of logic or mathematics then that can solve this problem. What then is the answer to this particular case? The court feels that in this case, as in all cases of this type, the mater of equity should be the determining factor and the court will decide the case on that basis.

The court will rule as is stated in the opinion that the plaintiff shall be entitled to a first lien on the two checks, namely, $3,832.94 and in the second case, $5,787.02. The court will rule that as a matter of equity, the lien holder shall have the next priority of any funds that might develop over that amount to the extent of $800.00 in the case on Lot No. 59, and $1,000.00 on Lot No. 60. The next priority in each case will go to the plaintiff, Kingsberry Homes, in the sum of $1,500.00 in each case. Here again is a matter of equity. While the Wright mortgage might, as a matter of law, be ahead of the mortgage, the court feels

that the wording in the Wright mortgage is such that it would be subsequent in priority to the plaintiff's mortgage, particularly to the amount that was paid out in violation of the admonishments in the *Wayne* v. *Yarborough case*. This case, however, out of the $4,357.06 advanced to the Maddox, but the plaintiff Wright received $1,500.00, and likewise, out of the check for $4,562.98, Wright also received $1,500.00, and on all premise of equity, Wright should not take advantage of this to claim priority for the claim of the mortgage. This is particularly true where the events, at least as far as the revenue stamps show, indicate that Wrights purchased each lot for the sum of $1,000.00, and while he had a perfect right to sell them to Maddox for $3,000.00 each, the facts are that he has already received his purchase price, plus a 50% profit, would go to the equities of the case.

Next would be the Wrights' claim for the sale of $1,500, as evidenced by his mortgage, which was properly filed, and the balance owing to the plaintiff, Kingsberry Mortgage Company.

All the parties should be entitled to interest at six per cent from the date of their respective claims.

Entry may be drawn by the attorney for the plaintiff and exceptions of both parties to the decision of the court noted.

*Judgment accordingly.*