**In re THE QUALSTAN CORPORATION,**
**Debtor.**

**Michael J. Baumann and Co., Inc., Plaintiff,**

**v.**

**The Qualstan Corporation, et al., Defendant.**

**Bankruptcy No. 02–60473.**
**Adversary No. 02–02542.**

United States Bankruptcy Court, S.D. Ohio, Eastern Division.

June 16, 2004.

Jon R. Philbrick, Columbus, OH, for Plaintiff.

Susan L. Rhiel, Columbus, OH, for The Qualstan Corporation.

Amelia A. Bower, Columbus, OH, for National City Bank.

Guy R. Humphrey, Columbus, OH, for Official Committee of Unsecured Creditors.

*ORDER AND DECISION ON COMPLAINT TO DETERMINE PRIORITY OF MECHANICS' LIENS*

DONALD E. CALHOUN, JR.,
Bankruptcy Judge.

This matter is before the Court after the trial on the Complaint to Determine the Priority of Mechanics' Liens obtained by Michael J. Baumann and Co., Inc. against property owned by Debtor, The Qualstan Corporation. In its Complaint, Michael J. Baumann and Co., Inc. ("Baumann") requests a determination that its mechanics' liens have priority over a mortgage on property held by National City Bank ("NCB") as per O.R.C. § 1311.13.

This Court is vested with jurisdiction over this matter pursuant to 28 U.S.C. § 1334(b) and the General Order of Reference entered in this district. This is a core proceeding under 28 U.S.C. § 157.

## I. Findings of Fact

Debtor, Qualstan Corporation ("Qualstan"), was a condominium developer and home builder in Columbus, Ohio that filed a petition for relief under Chapter 11 of the United States Bankruptcy Code on August 14, 2002. The Debtor developed many areas in and around Columbus, including distinct projects such as Holt Park, Brice Green, and Alkire Park. Qualstan defaulted on its line of credit with NCB around November, 2001. The default was triggered, in part, by the debtor building an excess number of spec homes.

Plaintiff, M.J. Baumann Company, was hired by the Debtor to perform plumbing contractor work. Baumann provided labor and materials for construction of various single family condominium units, including the Holt Park Section 3 and Brice Green Condominium Section 9 units. According to an uncontradicted affidavit and business records, construction and plumbing work commenced on the Holt Park III project in December, 1997. The Plaintiff did not get paid for labor and materials provided between October, 2001 and December, 2001 on the Holt Park III project. The Baumann Company was involved in several of Qualstan's construction projects, including the Holt Park and Brice Green projects. By agreement of the parties, Baumann's Brice Green mechanics' liens were not an issue for trial.

Defendant NCB provided a line of credit to the Debtor. On October 31, 1995, NCB filed a mortgage in Franklin County, Ohio. The mortgage, titled "Open–End Mortgage, Assignment of Rents and Security Agreement" (the "1995 Mortgage"), secured a $10,000,000.00 revolving line of credit promissory note. NCB does not contend that the Holt Park project was provided as security in the 1995 Mortgage. On December 9, 1997, the 1995 Mortgage was modified by the execution of a Mortgage Modification Agreement ("First Modification") between NCB and the Debtor. The First Modification was recorded in Franklin County on December 16, 1997. According to NCB, the First Modification was filed in the record **WITHOUT** the legal descriptions attached. The First Modification was subsequently refiled with the legal descriptions on March 16, 1998 ("Second Modification"). NCB states that the projects added to the 1995 Mortgage via the subsequent modifications included the Holt Park project. After the Second Modification, NCB filed various other modifications to the 1995 Mortgage that increased the line of credit and encompassed additional properties as security. The line of credit was extended to $25,000,000 per the final modifications.

The parties made various stipulations for trial. The relevant stipulations are delineated as follows:

1. The parties stipulate that each and every Affidavit for Mechanic's Lien as attached to Plaintiff's complaint was properly served pursuant to Ohio Rev.Code § 1311.06.

2. The parties stipulate that each and every Affidavit for Mechanic's Lien as attached to Plaintiff's complaint was properly served pursuant to Ohio Rev.Code § 1311.07.

3. The parties stipulate that work was commenced on Holt Park Phase III prior to the refiling of the Modification found in Instr. No. 199971216016479.

4. The parties stipulate that indebtedness on prior mortgages made by the debtor were paid from the proceeds of the National City Bank loan in the amount of $8,124,173 on or about October 27, 1995. The mortgages were filed in 1994 and 1995 to secure loans made to the debtor for projects known as McNeil Farms, Bethel Village, Hilliard Commons, Hilliard Village and Bethel Commons.

At trial, Edward Baumann, Vice–President of Michael J. Baumann and Co., Inc., testified that in his capacity as Vice–President, he was directly involved with the Qualstan Company and that he was responsible for cost estimates, price negotiations, draw scheduling and billing supervision with Qualstan. On May 9th of 2001, Edward Baumann approved and signed the construction agreement between the Baumann Company and Qualstan. The Baumann Company was to be paid for its work according to the draw agreements approved by Edward Baumann. According to these draw schedules, the Baumann Company was to be paid twice per unit, one time after the completion of rough-in work, and another time after the plumbing work was finished. The Baumann Compa-ny did not bill Qualstan for completed work; instead, Qualstan would pay the Baumann Company directly according to these schedules.

Mr. Robert Winner, Vice–President of NCB, testified that NCB issued a line of credit to Qualstan that funded many different construction projects. The funds were used for construction work as well as for company overhead. Other loans were made by NCB to Qualstan for the construction of a manufacturing facility. The Holt Park project was financed through the line of credit.

According to Mr. Winner, when Holt Park was started, Qualstan was to submit a monthly borrowing base schedule to determine how much money was to be lent. This schedule was similar to a draw schedule, allotting loan proceed disbursement as per the level of completion of construction work. Typically, these draw requests were submitted by Qualstan to NCB twice a month. Draws were requested after each home was in or through a certain stage of construction. At some time between May, 2001 and November, 2001, NCB ceased distributing loan funds based on a percentage of draw, and switched to distribution based on cost. According to Mr. Winner, this was done as part of NCB's continual effort to tighten its lending practices with Qualstan.

Mr. Winner stated that proceeds were generally disbursed to Qualstan. There were usually no payments made directly to subcontractors or materialmen. However, there was a time when Qualstan requested NCB to wire funds directly to contractors. In these cases, the money would be wired out of Qualstan's account with NCB after the bank deposited loan proceeds into the account. Thus, NCB never paid money directly to any subcontractors or contractors of Qualstan. Furthermore, NCB nev-

er paid any labor payrolls to subcontractors or contractors.

NCB's decision to stop funding Qualstan's draws was made in November of 2001. Money was still paid to Qualstan in an effort to cover company overhead so that Qualstan could sell homes and inventory. Several such sales were made by Qualstan, and the money generated by these sales was sent to NCB. During this time, NCB funded Qualstan's payroll. None of the individuals on Qualstan's payroll performed work on the Holt Park project.

## II. Discussion

NCB stipulated that the mechanics' liens filed by Baumann have no deficiencies. Further, the bank stipulated that the mechanics' liens were properly served and perfected by Baumann. Testimony at trial from Mr. Baumann indicates that Baumann had a contract to perform work at Holt Park III and that Baumann and the Debtor had an agreement for the payment of the work. Accordingly, this Court holds that Baumann had perfected mechanics' liens on the Holt Park III project pursuant to O.R.C. § 1311.

Because both Baumann and NCB have perfected liens on the Holt Park III project, the question that this Court must resolve is the priority of the liens. NCB made two main arguments in asserting that its mortgage liens have priority over the mechanics' liens obtained by Baumann. The first argument is that, pursuant to O.R.C. § 5301.232, NCB is entitled to priority over Baumann with regard to the distribution of proceeds from the Qualstan bankruptcy. Additionally, and in the alternative, NCB asserts that under O.R.C. § 1311.14 the lien of a mortgage given to improve real estate or pay off prior encumbrances trumps all mechanics' liens. Baumann argues that neither of the code

provisions applies because the mortgage reflecting Holt Park as security for the line of credit was not recorded until after his commencement of work in the Holt Park project and because the loan proceeds from NCB were not used by Qualstan in accordance with the statute.

### A. O.R.C. § 5301.232

In its summary judgment ruling, this Court denied NCB's claim that § 5301.232 grants NCB's mortgage priority over Baumann's mechanics' liens. However, to reiterate, the pertinent portions of Ohio Revised Code § 5301.232 state:

(A) Whether or not it secures any other debt or obligation, a mortgage may secure unpaid balances of loan advances made after the mortgage is delivered to the recorder for record, to the extent that the total unpaid loan indebtedness, exclusive of interest thereon, does not exceed the maximum amount of loan indebtedness which the mortgage states may be outstanding at any time. With respect to such unpaid balances, division (B) of this section is applicable if the mortgage states, in substance or effect, that the parties thereto intend that the mortgage shall secure the same, the maximum amount of unpaid loan indebtedness, exclusive of interest thereon, which may be outstanding at any time, and contains the beginning thereof the words "OPEN–END MORTGAGE."

(B) A mortgage complying with division (A) of this section and securing unpaid balances of loan advances referred to in such division is a lien on the premises described therein from the time such mortgage is delivered to the recorder for record for the full amount of the total unpaid loan indebtedness, including the unpaid balances of such advances that are made under such mortgage, plus interest thereon, regard-

less of the time when such advances are made. If such an advance is made after the holder of the mortgage receives written notice of a lien or encumbrance on the mortgaged premises which is subordinate to the lien of the mortgage, and if such holder is not obligated to make such advance at the time such notice is received, then the lien of the mortgage for the unpaid balance of the advance so made is subordinate to such lien or encumbrance. If an advance is made after the holder of the mortgage receives written notice of work or labor performed or to be performed or machinery, material, or fuel furnished or to be furnished for the construction, alteration, repair, improvement, enhancement, or embellishment of any part of the mortgaged premises and if such holder is not obligated to make such advances at the time such notice is received, then the lien of the mortgage for the unpaid balance of the advance so made is subordinate to a valid mechanic's lien for the work or labor actually performed or machinery, material, or fuel actually furnished as specified in such notice.

Ohio Revised Code § 5301.232.

■ Under O.R.C. § 5301.232, "an advance made by the holder of an open-end mortgage has priority over other liens unless the mortgagee (1) has notice of the other liens and (2) is not obligated to make the advance." *Colonial Mortgage Service v. Southard et al.,* 56 Ohio St.2d 347, 349, 384 N.E.2d·250 (1978). In this case, this Court must determine if NCB's various mortgages and modifications meet all of the requirements of O.R.C. § 5301.232.

■ NCB argues that "each of the modifications relates back to the 1995 Mortgage and since this matter turns, in part, on the form and substance of the Mortgage, any decision relating to priorities must start with the terms of the Mort-

gage. . . . Because the Mortgage contains the statutory language and advances made are obligatory, NCB is entitled to priority over the Baumann liens." Essentially, NCB argues that December, 1995 is the date of perfection for Holt Park III because all subsequent modifications relate back to the 1995 Mortgage. Baumann takes exception to that interpretation and states that NCB's priority only relates to the time of the *refiling* of the First Modification as opposed to the date of the filing of the Mortgage or the First Modification.

■ As held in this Court's summary judgment ruling, Baumann's interpretation of § 5301.232 is correct. Section 5301.232(B) states that "[a] mortgage ... securing unpaid balances of loan advances ... is a lien on the premises **described therein from the time such mortgage is delivered to the recorder for record ...**" O.R.C. § 5301.232(B) [emphasis added]. NCB's 1995 Mortgage was filed in December, 1995. However, NCB did not file any security instrument securing the Holt Park real estate until December 16, 1997, when it filed the First Modification, and even then NCB failed to record a description of the Holt Park project. It was not until March 16, 1998, that NCB filed proper modifications with the proper legal descriptions of the Holt Park real estate. The statute is very clear. A mortgage is only a lien when the premises are described therein and recorded. *See French's Inc. v. Dominic Construction, Inc.,* 1995 WL 1100094 (Ohio App.11th Dist. June 30, 1995). This Court finds that NCB did not have proper liens on the Holt Park real estate until March 16, 1998; the date that the Second Modification with proper legal description of the Holt Park project was recorded.

Indeed, this is the only finding that this Court can make. It was not until March 16, 1998, that NCB put the world on notice

that it was using the Holt Park project as security for the money it advanced to the Debtor. NCB's argument that the date of priority with respect to the Holt Park project should be December 1995, when it filed its Mortgage, does not follow logically. Evidence presented at trial failed to demonstrate that Qualstan even owned the Holt Park real estate in 1995. If Holt Park was not even owned by Qualstan in 1995, how could it offer it to NCB as security in 1995? Certainly, the mere filing of a modification years later does not and cannot change the logic that the Holt Park real estate was not offered as security by the Debtor in the 1995 Mortgage.

■ Because NCB did not have a proper lien on the Holt Park project until March 16, 1998, NCB cannot be granted priority over Baumann's mechanics' liens pursuant to § 5301.232. In Ohio, "[w]hen work is done pursuant to a contract with the vendee, mechanics' liens attach ... at the time of the commencement of construction ..." *Wayne Bldg. & Loan Co. v. Yarborough,* 11 Ohio St.2d 195, 205, 228 N.E.2d 841 (1967) (citing O.R.C. §§ 1311.02 and 1311.13). Baumann has proven via affidavits and business records that work commenced on the Holt Park III project in December, 1997. The parties also stipulated that work commenced on the Holt Park III project prior to the refiling of the Holt Park III mortgage modification. Thus, because Baumann's mechanics' liens attached in December, 1997 prior to NCB's mortgage lien, NCB cannot have priority pursuant to § 5301.232.

### B. O.R.C. § 1311.14

NCB also argues that its loans should be given priority over Baumann's mechanics' liens because the loans NCB granted to the Debtor under the 1995 Mortgage and subsequent modifications were construc-

tion loans as defined in § 1311.14. Construction loans as defined under § 1311.14 have priority over valid mechanics' liens. Section 1311.14 states, in pertinent part:

Except as provided in this section, the lien of a mortgage given in whole or in part to improve real estate, or to pay off prior encumbrances thereon, or both, the proceeds of which are actually used in the improvement in the manner contemplated in sections 1311.02 and 1311.03 of the Revised Code, or to pay off prior encumbrances, or both, and which mortgage contains therein the correct name and address of the mortgage, together with a covenant between the mortgagor and mortgagee authorizing the mortgagee to do all things provided to be done by the mortgagee under this section, shall be prior to all mechanic's, materialmen's, and similar liens and all liens provided for in this chapter that are filed for record after the improvement mortgage is filed for record, to the extent that the proceeds thereof are used and applied for the purposes of and pursuant to this section. Such mortgage is a lien on the premises therein described from the time it is filed for record for the full amount that is ultimately and actually paid out under the mortgage, regardless of the time when the money secured thereby is advanced.

O.R.C. § 1311.14.

■ Section 1311.14 was enacted with the intent to give to a construction mortgage priority over mechanics' liens although the mortgage was recorded subsequent to the effective date of the mechanics' liens. *See Connecticut Gen. Life Ins. Co. v. Birzer Bldg. Co.,* 101 N.E.2d 408 (C.P. Hamilton County 1950) (referring to General Code Section 8321–1, the predecessor to O.R.C. § 1311.14). *See also Kingsberry Mortg. Co. v. Mad-*

*dox,* 42 O.O.2d 158, 13 Ohio Misc. 98, 233 N.E.2d 887 (C.P. Clermont County 1968). Under legislation enacted prior to § 1311.14, any mortgage given or recorded after the commencement of the work was junior to all mechanics' liens on the property, and the mortgage was subject to all liens for labor or material, regardless of whether it was furnished before or after the mortgage was recorded. *See Knollman Lumber Co. v. Hillenbrand,* 16 Ohio Op. 530 (C.P. Hamilton County 1940) *modified on other grounds,* 18 O.O. 62, 64 Ohio App. 549, 29 N.E.2d 61 (Ct.App.1st Dist.1940). With an inability to obtain priority over subsequently filed mechanics' liens, lenders were often unwilling to advance the funds necessary for the completion of already commenced construction projects. Section 1311.14 was therefore enacted by the legislature. It meant to prevent the stopping of building operations that was often caused by the priority granted to mechanics' lien holders under prior law. *Id.*

 Section 1311.14 plainly delineates ways in which a construction lender may loan money and retain priority over subsequent mechanics' lien holders. *See generally Kingsberry Mortg. Co.,* 13 Ohio Misc. 98, 233 N.E.2d 887. A mortgage that does not comply with the law set forth in § 1311.14 will not be entitled to construction mortgage priority where work has commenced before the mortgage is filed for record. *See Golner v. Bede,* 11 Ohio App. 137 (Ct.App.6th Dist.1919); *Ohio Sav. Ass'n v. Bell,* 25 Ohio App. 84, 158 N.E. 548 (Ct.App.6th Dist.1926); *Canton Morris Plan Bank v. Most,* 44 Ohio App. 180, 184 N.E. 765 (Ct.App.5th Dist.1932); *Shannon Co. v. Wurlitzer,* 45 Ohio App. 194, 186 N.E. 879 (Ct.App. 1st Dist.1932). Furthermore, equity will not disregard the plain language of § 1311.14 to sidestep the consequences of the mortgagee's own carelessness in failing to follow the guidelines proscribed by law. *See In re Braker,* 127 F.2d 652 (6th Cir.1942). When a mortgagee does not provide reasonable and substantial compliance with the provisions of the construction mortgage statute, the equities are in favor of the prior lien claimants. *See Valley Homes, Inc. v. Futura Const. Co.,* 192 N.E.2d 330 (Ohio App.1st Dist.1963).

In the case *sub judice,* it is undisputed that NCB's mortgage contains the correct name and address of the mortgagee and recites the necessary covenant. Thus, NCB's loan may have priority over Baumann's mechanics' liens, but only to the extent that the loan otherwise meets with the requirements of § 1311.14.

Another part of § 1311.14 states:

The mortgagee need not pay out any of the mortgage fund for fifteen days after filing the mortgage. At the end of such period, he may refuse to go forward with the loan or to pay out of the fund, in which case, if no funds have been advanced, he shall make, execute, and deliver to the mortgagor, or to the county recorder to be recorded, a proper release of the mortgage, **but if the mortgagee elects to complete the loan, he shall, in order to obtain the priority set fourth in this section, distribute the mortgage fund in the following order:**

(A) The mortgagee may at any time pay off the prior encumbrance, or withhold the amount thereof for that purpose.

(B) Out of the residue of the fund, the mortgagee may at any time retain sufficient funds to complete the improvement, according to the original plans, specifications, and contracts, and within the original contract price.

(C) The mortgagee may from time to time pay out on the owner's order, directly to the original contractor or subcontractor, or to the owner himself if he is his own contractor, such sums as the owner certifies to be necessary to meet and pay labor payrolls for the improvement.

(D) The mortgagee shall pay on the order of the owner, the accounts of the materialmen and laborers who have filed with the mortgagee a written notice as provided in this section, the amounts due for labor or work then performed and material then furnished for the improvement; and shall retain out of the mortgage fund such money to become due as is shown by the notice served and shall hold such money, and shall pay on the order of the owner, the amounts due to such persons who have served such notices, if the mortgagee has sufficient money in his hands to do so and also to complete the improvement; but if the mortgagee has funds in his hands insufficient to pay all such laborers and materialmen in full and to complete the improvement, he shall retain sufficient money to complete the improvement and to distribute the balance pro rata among the materialmen and laborers who have filed such notices.

(E) If the owner refuses to issue an order to pay the amount of the notice filed, the mortgagee shall retain the whole amount claimed until the proper amount has been agreed upon or judicially determined, provided that the mortgagee may withhold sufficient funds to complete the improvement.

(F) The mortgagee shall pay out on the owner's order, directly to materialmen or laborers who have performed labor or work or furnished material for the improvement.

(G) The mortgagee shall pay the balance of the mortgage fund after the improvement is completed to the owner, or to whomsoever the owner directs.

**In case the mortgagee pays out the fund otherwise than as provided in this section, then the lien of the mortgage to the extent that the funds had been otherwise paid, is subsequent to liens of original contractors, subcontractors, materialmen, and laborers;** but in no case is such a mortgagee obligated to pay or liable at law for more than the principal of the mortgage.

*Id.* (emphasis added). This portion of § 1311.14 states that the only way a construction loan can obtain priority over mechanics' liens is if the proceeds of the construction loan were distributed in a manner defined under subsections A through G. *See Barr v. Masterpiece Homes,* 1994 WL 385998 (Ohio App. 8th Dist.). Thus, in determining the priority of NCB's loan funds, this Court must examine whether NCB paid out proceeds of the loan as described in § 1311.14(A) through (G).

 Failure to pay out a portion of the mortgage funds in the manner authorized by § 1311.14 does not result in a forfeiture of priority as to the entire mortgage amount. Instead, a construction mortgage is accorded priority only to the extent that the money is paid to the mortgagor in the legally prescribed manner. *See First Savings & Loan Co. v. Ward,* 22 Ohio L. Abs. 184, 1936 WL 4286 (Ohio App.9th Dist.1936); *Ulmer v. Portage Construction & Finance Co.,* 1923 WL 2058 (C.P. Summit County 1923); *In re Taylor,* 16 F.2d 303 (S.D.Ohio 1926) *modified on other grounds,* 20 F.2d 8 (C.C.A. 6th Cir. 1927). The portion of the mortgage funds paid out in a manner inconsistent with § 1311.14 will not attain priority over mechanics' lien holders under the construc-

tion mortgage statute. *See Knollman Lumber Co.,* 16 Ohio Op. 530, 6 Ohio Supp. 342.

Before the Court analyzes § 1311.14(A) through (G) to determine whether NCB can be granted a full or partial priority on its lien, the Court will comment on the difficulty of applying the NCB loan to § 1311.14(A) through (G). A thorough analysis of O.R.C. § 1311.14 leads to the conclusion that the statute, in contradiction to the intentions of the legislature, perhaps opened the door for certain unintended types of loans to obtain priority over mechanics' lines. Certain difficulties arise any time parties attempt to use a statute for purposes other than the specific purpose for which the statute was enacted. NCB, in asserting that the money it lent to Qualstan as part of a revolving credit line should be granted priority over the Baumann Company's mechanics' liens, has created a situation in which this Court is faced with these exact difficulties. In a sense, this Court must rule on a dilemma in which NCB is attempting to force a square peg into a round hole.

An analysis of the type of loan NCB provided to Qualstan will evince the dilemma that the Court is encountering. NCB provided a line of credit to Qualstan. This line of credit was much bigger than ordinary construction loans. Qualstan and NCB first reached terms for the line of credit in 1995. Over the following six years, the line of credit grew and there were seven different modifications to the mortgage securing the line of credit. The amount Qualstan could borrow under the line of credit increased from $10,000,000 in 1995 to $25,000,000 in 2001. The way Qualstan could borrow funds under the line of credit changed over the years as well. As it became apparent that Qualstan might have been abusing the way it went about borrowing funds, NCB became con-

servative in its lending practices under the loan. According to NCB, beginning in May, 2001, the loan, which was initially a type of a line of credit, evolved into a draw-type construction loan.

The line of credit also covered the development of a great many projects. Although the funds from the line of credit were diverted at least once by the principal of Qualstan, the line of credit essentially funded the building of condominiums and single-family houses around the Columbus area. There were not less than five distinct projects or developments that were funded by the line of credit. Even the distinct projects were themselves segregated into different phases of development. Each phase of development had its own plans and its own timetable for construction.

When applying Section 1311.14 to this type of a line of credit, it becomes clear that the statute was not specifically enacted with the purpose of bringing within its protection evolving loans that funded many different and distinct developments. In light of this difficulty, it remains NCB's argument that O.R.C. § 1311.14 grants priority to the funds that it lent to Debtor Qualstan. This Court notes that it has not found any case authority which applies such vast lines of credit to § 1311.14. Although there is no dearth of case law in this area, most are limited to construction loans that fund individual units rather than multiple projects.

The following hypothetical will illustrate the difficulty of applying a vast line-of-credit loan to § 1311.14. Developer, who is in the business of building houses, owns Blackacre, Blueacre, Greenacre, Brownacre and Redacre. Developer has secured a line of credit from Bank to finance the development of the projects. The Bank has taken a mortgage on the projects. While the Developer has not started build-

ing houses on Blackacre, the other projects are substantially complete with hundreds of houses built on each project. The Bank has lent the Developer over $15 million on the line of credit. Because of a depression in housing market, the Developer is in substantial debt. The Bank declares an event of default. Contractor, who has worked on Blackacre building streets, filed a valid mechanics' lien. Both Bank and Contractor claim priority on Blackacre. The Bank, which has not loaned a cent for improvements made to Blackacre, claims protection under § 1311.14 for Blackacre because it has loaned $15 million for the other projects.

■ The question that arises under the hypothetical is whether the Bank should be granted § 1311.14 protection. As stated above, the statute and case authority are silent on this issue. In this case, where the factual scenario is not dissimilar to the hypothetical, the Court, relying on logic and equity, will apply a project-by-project scope to the § 1311.14 inquiry. Essentially, the Court will only grant priority pursuant to § 1311.14 to the extent funds have been disbursed to make improvements on individual developments. The Court will not take a collective approach—priority for improvements made to one project will not be extended to other distinct projects.[1] It only seems reasonable that a lender that did not give funds on a distinct project for improvements should not be granted priority under § 1311.14.

The Court will now analyze NCB's loan within the context of § 1311.14(A) through (G) to determine if priority can be granted. As per NCB's own motions and memoranda, paragraphs (D), (E), and (G) of § 1311.14 are not applicable to its mortgage. The Court, on its own survey, also finds that subsections (D), (E), and (G) are not applicable. This Court must therefore only determine if the distribution requirements set fourth in (A), (B), (C), and (F) were followed. Section 1311.14(A), providing that the mortgagee may first pay off a prior encumbrance, refers only to encumbrances filed before the commencement of the work. See *French's Inc.*, 1995 WL 1100094. Subsection (A) is specifically meant only to allow a construction mortgagee the option of discharging prior encumbrances on the mortgaged property or taking its mortgage subject to such prior encumbrances. See *Connecticut Gen. Life Ins. Co.*, 101 N.E.2d 408.

■ NCB's first argument, that § 1311.14(A) grants priority to a portion of the mortgage fund used to pay off a prior encumbrance on a property owned by Qualstan relies on a misguided reading of the statute. Baumann's mechanics' liens are liens granted against the property known as the Holt Park property. Section 1311.14(A) allows mortgage funds to obtain priority over mechanics' liens only when the prior encumbrance paid off by the bank is an encumbrance on the property later encumbered by the mechanics' liens. Section 1311.14(A) is specifically designed to allow a lending bank to discharge prior encumbrances on the property in lieu of taking its mortgage secondarily to other

---

1. The Plaintiff has asked the Court to take it a step further. The Plaintiff has mechanics' liens on specific condominiums within the Holt Park III development and argues that § 1311.14 priority should only be granted to the extent that the bank paid draws on those condominiums. The Court cannot reach this conclusion. Although no evidence was presented in this case with respect to funding of common areas, it is conceivable that loans might have been granted for the building of streets, water-retention ponds, etc. Further, analyzing the loan funds made for individual condominiums may not provide an accurate picture as to the true amount of loans funded for a pro rata share of the development.

such encumbrances while retaining the loans construction mortgage priority. *Connecticut Gen. Life Ins. Co. v. Birzer Bldg. Co.*, 101 N.E.2d 408. NCB has not demonstrated that any portion of the funds lent to Qualstan were used to satisfy prior encumbrances on the Holt Park property. Rather, NCB claims that it should have priority over the mechanics' liens claimants because its line of credit was used to pay some prior encumbrances on unrelated property in 1995. The Court does not believe that the payment of encumbrances on unrelated properties should allow NCB under the statute to gain priority vis-à-vis Holt Park III project. Therefore, no part of the loan proceeds lent to Debtor can obtain priority over Baumann's mechanics' liens under O.R.C. § 1311.14(A).

Section 1311.14(B) allows construction lenders to retain sufficient funds necessary for completing construction according to the original plans and specifications, and within the original contract price. NCB's second argument, that § 1311.14(B) allows the portion of its mortgage held for the completion of the Holt Park project to obtain priority over Baumann's mechanics' liens, must also fail. § 1311.14(B), when read with the rest of the construction mortgage statute in mind, allows a construction mortgage to obtain priority to the extent that such mortgage funds are retained by the lender for the eventual completion of the construction project. This provision is a logical result of typical construction lending practices. Typically, construction projects are financed in a series of draws with the bank retaining portions of the mortgage proceeds for distribution to the mortgagee after certain aspects of construction are completed.

To allow NCB to obtain priority over Baumann's mechanics' liens based upon § 1311.14(B) would unjustly expand the construction mortgage statute. NCB's loan to Debtor took the form of a revolving line of credit, used by Debtor to finance multiple construction projects. Mr. Winner, from NCB, testified that there was some $50,000 on the line of credit available for distribution when the default was declared. Mr. Winner, however, did not and probably could not state that this $50,000 was earmarked the Holt Park III project.[2] NCB has been unable to demonstrate what portion of the mortgage funds were set aside for the completion of the Holt Park III project. Allowing NCB to prevail on the theory that all mortgage funds remaining in its possession at the time lending to Debtor was stopped qualify as § 1311.14(B) funds would unjustly result in the commingling of funds reserved for various construction projects. As NCB has been unable to demonstrate any particular fund set aside for the completion of Holt Park III, its § 1311.14(B) priority claim must be denied.

Subsection (C) allows a construction mortgagee to pay on the owner's order the amounts certified by the owner to be necessary to meet and pay labor payrolls for the improvement directly to contractors or subcontractors, or to the owner personally if the owner is acting as the contractor. O.R.C. § 1311.14(C). This provision, when construed in accord with the rest of § 1311.14, ensures that the disbursements made by the mortgagee are for actual use in improvements on the land. *See Knollman Lumber Co.*, 18 O.O. 62, 64 Ohio App. 549, 29 N.E.2d 61.

---

**2.** Indeed, in a related case that involves the same line of credit but a different project, NCB makes the same claim for priority under

§ 1311.14(B). This certainly gives an indication that this residue was not earmarked for any one single project.

In *Masterpiece Homes*, 1994 WL 385998, *14, the court held that a lender disbursing mortgage proceeds directly to the general contractor has the burden of proving that the funds were disbursed in pursuance of a certification made by the owner stating that the disbursement amount was necessary to meet labor payrolls. The court specifically stated, "[t]he burden, then, is on the appellee to show that the finds were disbursed to Kresz Builders, Inc. pursuant to a certification from the owner of the property that the sums were necessary to meet and pay labor payrolls for the construction." *Id.* The bank provided two pieces of evidence in *Masterpiece Homes* to prove a case under § 1311.14(c). First, there was "deposition testimony . . . that all of the funds received from TransOhio were used exclusively for the construction of the house." *Id.* Second, there were requests for draws that stated, "[y]ou are hereby requested to reimburse me for payments made to date to subcontractors, materialmen, and/or laborers for *materials* and/or labor supplied at the premises set forth below, and to charge my construction loan accounts accordingly." *Id.* [emphasis added.] Although § 1311.14(c) only grants priority to funds given to meet labor payrolls, the Court in *Masterpiece Homes* apparently granted priority to funds lent for materials as well.

Section 1311.14(F) allows money to be disbursed from the mortgage fund in a manner similar to the manner authorized under section 1311.14(C). While (C) allows mortgage funds to be distributed to contractors or subcontractors upon the owner's certification that such disbursements are necessary to meet labor payrolls, (F) allows mortgage funds to be disbursed, upon the owners order, to materialmen and laborers who have furnished material or labor for the construction project. Such distributions, according to the plain language of the statute, are to be made upon the owners order. It should be noted, however, that (F) in no way creates a legal obligation for laborers or materialmen to request such a distribution from the lending bank. Instead, the plain language of (F) serves to affirmatively require only the owner's order for such distributions.

In this case, there is evidence that mortgage funds may have been paid by NCB directly to materialmen and laborers on the owner's orders and certification. During the trial, Mr. Winner, a Vice President for NCB testified as follows:

"A. [Winner] Occasionally—Sometimes Qualstan would request us to wire funds to their contractors. We would not necessarily know what that—those amounts were for or if they were for specific units or anything like that. But sometimes in their scheduled payments, as Mr. Baumann testified to earlier, we would wire those for Qualstan.

Q. [Counsel] So let me see if I have this right. Qualstan submits a draw request in compliance with the loan documents. Part of that draw request might be, for instance, to pay Baumann's indebtedness for plumbing work. So if Qualstan directed the bank to do so, you would wire "X" amount of dollars to Baumann; right?

A. Yes.

 \* \* \* \* \* \*

Q. Can you tell the Court, generally speaking, what Exhibit V–52 is?

A. This is a similar document that we just talked about, the "Summary by Vendor" document. Qualstan is requesting these funds be wired to their subcontractors.

Q. So according to your loan agreements with Qualstan, the bank, National City Bank, wired to Mr. Baumann's Company 351,045 in July of 2001; right?

A. That's correct.

The document V–52 related to the Holt Park III project. This document along with Mr. Winner's testimony establishes that at least $351,045 from NCB's line of credit were given to contractors pursuant to the owner's order to meet labor payrolls or for materials. There is also no testimony to contradict the document or the testimony of Mr. Winner. Thus, pursuant to § 1311.14(F), NCB has priority over Baumann with respect to that amount.

### III. CONCLUSION

Baumann cannot be given relief requested in its Complaint. Although Baumann had a valid mechanics' lien that attached to the Holt Part III project, O.R.C. § 1113.14 gives NCB priority at least to the first $351,045 realized from any post-petition sale of Holt Park III condominiums. Because NCB's priority amount is greater than Baumann's mechanics' liens, Baumann does not have any right to the funds from the Holt Park III project.

IT IS SO ORDERED.