[Cite as *APCO Industries, Inc. v. Braun Constr. Group, Inc.*, 2020-Ohio-4762.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| APCO Industries, Inc., | : | |
| Plaintiff-Appellee, | : | No. 19AP-430 |
| | | (C.P.C. No. 09CV-9698) |
| v. | : | |
| | | (REGULAR CALENDAR) |
| Braun Construction Group, Inc. et al., | : | |
| Defendants-Appellees. | : | |
| KeyBank National Association et al., | : | |
| Plaintiffs-Appellees, | : | |
| | | No. 19AP-431 |
| v. | : | (C.P.C. N0. 09CV-9921) |
| Columbus Campus, LLC et al., | : | (REGULAR CALENDAR) |
| Defendants-Appellees, | : | |
| (Braun Construction Group, Inc. et al., | : | |
| Defendants-Appellants). | : | |

D E C I S I O N

Rendered on October 1, 2020

**On brief:** *Porter, Wright, Morris & Arthur, LLP, Jared M. Klaus, Polly J. Harris,* and *David S. Bloomfield, Jr.*, for appellees.

**On brief:** *Kevin E. Humphreys*, for appellants Braun Construction Group, Inc., and John Eramo & Sons, Inc.

APPEALS from the Franklin County Court of Common Pleas

KLATT, J.

{¶ 1} Counterclaimants-appellants, Braun Construction Group, Inc., and John Eramo & Sons, Inc., appeal a judgment of the Franklin County Court of Common Pleas that granted summary judgment to counterclaimants-defendants-appellees, KeyBank National Association; Fifth Third Bank; NBH Bank, NA, f.k.a. Bank Midwest, NA, f.k.a. Hillcrest Bank, NA, f.k.a. Hillcrest Bank; Manufacturers and Traders Trust Company as successor to Wilmington Trust FSB; Arvest Bank, f.k.a. Solutions Bank; and First Commonwealth Bank (collectively "Lenders"). For the following reasons, we affirm that judgment in part and reverse it in part.

{¶ 2} This case arises out of the unsuccessful development of a 1,745-unit continuing care retirement community in Hilliard, Ohio known as Hickory Chase. Erickson Retirement Communities, LLC, a developer of multiple continuing care retirement communities across the United States, conceived the Hickory Chase project. Erickson formed Columbus Campus, LLC, a wholly owned subsidiary, to own the property and borrow money to construct the community.

{¶ 3} Erickson requested that KeyBank arrange the primary financing for the Hickory Chase project. KeyBank approved a $20 million loan and secured an additional $60 million in financing from other lenders, with each lender committing a set amount. On April 16, 2008, Columbus Campus and the Lenders entered into a Construction Loan Agreement providing Columbus Campus with a revolving loan not to exceed $90 million. KeyBank, as lead arranger and administrative agent for the Lenders, secured the loan with an Open-End Mortgage, Assignment of Rents and Leases, Security Agreement, and Fixture Filing, which KeyBank filed with the Franklin County Recorder. KeyBank also obtained a Guaranty Agreement executed by Erickson.

{¶ 4} Columbus Campus borrowed an additional $21,350,000 from Windsor OH Holdings, LLC pursuant to a Loan Agreement executed on April 16, 2008. Windsor also protected its loan with a Mortgage, Assignment of Rents and Leases, Security Agreement and Fixture Filing, which Windsor filed with the Franklin County Recorder. Windsor, however, agreed to subordinate its interests to those of the Lenders in a Subordination and Standstill Agreement it executed with KeyBank. Because Windsor subordinated its interests, its loan constituted mezzanine financing.

{¶ 5}    Columbus Campus hired Braun as the general contractor for the first phase of construction of the Hickory Chase project.  Braun, in turn, contracted with a number of subcontractors, including Eramo.

{¶ 6}    Construction on the first phase of Hickory Chase progressed steadily throughout 2008 and the winter of 2009.  Throughout that period, Columbus Campus relied on the revolving loan to fund the construction.  Columbus Campus submitted monthly requests for the disbursement of loan funds to KeyBank, as the administrative agent of the Construction Loan Agreement.  Each request sought funds to pay for the materials used and work performed on the Hickory Chase project during the prior month.  KeyBank regularly disbursed loan proceeds to Columbus Campus on or near the 20th of each month.  Columbus Campus then used those funds to pay Braun.  Using this process, Braun received payments totaling $26,413,939.89 for work performed through February 28, 2009.[1]  This process, however, came to an abrupt halt after KeyBank's receipt of the April 2009 request for payment.

{¶ 7}    In April 2009, Columbus Campus failed to make an interest payment on the $21,350,000 loan that Windsor had extended to it.  In a letter dated April 10, 2009, Windsor informed Columbus Campus that its failure to make the interest payment constituted an Event of Default under the Windsor Loan Agreement.[2]  Moreover, Windsor advised Columbus Campus that, as a result of the Event of Default, it was accelerating the loan balance and declaring the full principal amount due and payable.

{¶ 8}    Windsor shared the April 10, 2009 letter with KeyBank.  In a letter to Erickson dated April 21, 2009, KeyBank stated, "Under Section 9.1 of the [Construction] Loan Agreement, a default or the occurrence of an Event of Default with respect to the Mezzanine Financing would constitute an Event of Default under the [Construction] Loan

---

[1] In total, KeyBank disbursed loan proceeds amounting to $45,441,241.68 to Erickson or Columbus Campus under the Construction Loan Agreement.

[2] Under Section 21.1 of the Windsor Loan Agreement, an "Event of Default" "constitute[d] a breach of th[e] Agreement" and included the "fail[ure] to pay, within five (5) days of when due, any sums payable under the Mezzanine Note or this Agreement."  (Ex. 10, Jan. 24, 2011 Stipulations.)  The Mezzanine Note required Columbus Campus to make an interest payment on the first of each month.

Both the Windsor Loan Agreement and the Construction Loan Agreement capitalize defined terms.  We will capitalize those defined terms in this decision as well.

Agreement."[3]   (Ex. 11, Kleinhaut Dep.)   KeyBank informed Erickson that, due to "the apparent Event of Default," the Lenders had decided to suspend further monthly advances under the Construction Loan Agreement.  *Id.*

{¶ 9}   KeyBank followed up its April 21, 2009 letter with a second letter, dated April 28, 2009.  In this second letter, KeyBank again referred to the April 10, 2009 letter from Windsor declaring that an Event of Default had occurred under the Windsor loan and accelerating the loan balance.  KeyBank then stated:

> Under Section 9.1 of the [Construction] Loan Agreement, a default or the occurrence of an Event of Default with respect to the Mezzanine Financing constitutes an Event of Default under the [Construction] Loan Agreement.  Other events of default may also exist under the [Construction] Loan Agreement.  This letter constitutes notice of default, and interest will now be charged at the Default Rate, and the Loan is now due and payable.

(Ex. 172, Shoop Dep.)

{¶ 10}  Despite the existence of an Event of Default, KeyBank assured Erickson and Columbus Campus that it "and the Lenders are not exercising any of their rights under the [Construction] Loan Agreement or the Loan Documents."  *Id.*  The Lenders wanted to work with Erickson and Columbus Campus to see if the parties could enter into a forbearance agreement.  KeyBank represented that the Lenders would only exercise their rights and remedies under the Construction Loan Agreement if the parties did not execute a forbearance agreement by May 15, 2009.

{¶ 11}  The next day, April 29, 2009, Windsor rescinded and revoked its April 10, 2009 default letter and the Event of Default referenced therein.  In a letter dated April 30, 2009, Erickson informed KeyBank of Windsor's actions and posited that the rescission and revocation cured the Event of Default under the Construction Loan Agreement.  The April 30, 2009 letter also directed KeyBank to Section 3.2 of the Subordination and Standstill Agreement between KeyBank and Windsor.  Erickson interpreted that section to

---

[3] Under Section 9.1(y) of the Construction Loan Agreement, an "Event of Default" occurred upon "any default, and expiration of any stated grace or cure period, or the occurrence of any Event of Default (so defined) pursuant to any of the documents executed and delivered in connection with the Mezzanine Financing[.]"  (Ex. 14, Jan. 24, 2011 Stipulations.)

prohibit cross default under the Construction Loan Agreement if Columbus Campus defaulted under the Windsor Loan Agreement.

{¶ 12} KeyBank's attorney responded to Erickson's April 30, 2009 letter with a letter dated May 8, 2009. In the May 8, 2009 letter, KeyBank's attorney stated, "[T]he Lenders respectfully disagree with both your characterization of the purported recission by Windsor and your conclusion (or opinion) that somehow the Event of Default has been cured." (Ex. 17, Kleinhaut Dep.) KeyBank's attorney also asserted that other Events of Default existed under the Construction Loan Agreement, and he wrote, "By way of example, * * * it is inconceivable how the Borrower could today, in good faith, reasonably argue that nothing has occurred and that no condition or situation exists which constitutes a material adverse change with respect to the Project."[4] *Id.*

{¶ 13} Erickson, acting as agent for Columbus Campus, directed Braun to suspend work on the Hickory Chase project in a letter dated May 11, 2009. The last loan proceeds KeyBank had advanced to Columbus Campus had paid for construction performed during February 2009. Between March 1, 2009 and the stoppage of work, Braun and its subcontractors had provided, but had not received payment for, $9,178,230.44 of labor and materials.

{¶ 14} On May 15, 2009, Columbus Campus, Erickson, and KeyBank entered into a forbearance agreement, whereby the Lenders agreed not to exercise any rights or remedies they had under the Construction Loan Agreement due to the alleged Events of Default for 15 days. Before those 15 days elapsed, the parties executed a second agreement extending the standstill period to July 1, 2009. Then, on July 1, 2009, the parties entered into a third forbearance agreement, but on markedly different terms. In the third agreement, the Lenders agreed not to exercise any of their contractual rights or remedies for an additional 30 days, with the exception of their right to foreclose. Not only did Columbus Campus concede to a foreclosure action, it also agreed to file an answer consenting to judgment in the Lenders' favor.

{¶ 15} On July 2, 2009, the Lenders filed for foreclosure against Columbus Campus. The Lenders also named as defendants Braun and all the subcontractors that worked on

---

[4] Under Section 9.1(0) of the Construction Loan Agreement, an "Event of Default" occurred if, "in the Administrative Agent's sole judgment, [any condition or situation] constitute[d] a material adverse change with respect to the Project * * *." (Ex. 14, Jan. 24, 2011 Stipulations.)

the Hickory Chase project, including Eramo, because they had filed mechanics' liens against the project. The Lenders later amended their complaint to include Erickson as a defendant and added a claim for breach of the Guaranty Agreement.[5]

{¶ 16} Columbus Campus filed an answer that admitted to defaulting under the Construction Loan Agreement and consented to foreclosure. Braun filed an answer and a cross-claim against Columbus Campus. Eramo filed an answer, a counterclaim against the Lenders, and a cross-claim against Columbus Campus and Erickson.

{¶ 17} In October 2009, Erickson and Columbus Campus filed for bankruptcy, which stayed the foreclosure action. However, in May 2010, the bankruptcy court permitted the foreclosure action to proceed, so the trial court lifted the stay.

{¶ 18} Once foreclosure proceedings resumed, the Lenders and the subcontractors filed opposing motions for summary judgment on the issue of lien priority. The trial court granted the Lenders' motion and denied the subcontractors' motion, finding that the construction mortgage had priority over the subcontractors' mechanics' liens.[6] This court affirmed that judgment. *KeyBank NA v. Columbus Campus, LLC*, 10th Dist. No. 11AP-920, 2013-Ohio-1243.

{¶ 19} While the appeal of the lien-priority judgment was pending, the trial court granted the Lenders' motion for summary judgment on their claim for foreclosure. Ultimately, the Hickory Chase property sold in two lots, and the trial court confirmed the sales in entries dated September 6 and 9, 2013. The Lenders received $1.78 million from the sale of the first lot. Additionally, the Lenders recouped approximately $3 million from other sources. Braun and the subcontractors recovered nothing from the sale of the Hickory Chase property.

{¶ 20} In a scheduling order dated October 18, 2013, the trial court (1) gave Braun leave to file a counterclaim against the Lenders and (2) permitted Eramo to amend its counterclaim against the Lenders. Braun and Eramo filed their counterclaims on November 15, 2013. Both counterclaims included claims for constructive fraud, breach of

---

[5] In July 2010, the Lenders voluntarily dismissed their claim for breach of the Guaranty Agreement.

[6] Later, the trial court also denied Braun's motion for summary judgment on the question of lien priority, finding that the Lender's construction mortgage had priority over Braun's mechanic's lien. Braun did not appeal that judgment.

the Construction Loan Agreement, and promissory estoppel. Braun also separately asserted claims for tortious interference with contracts, as well as breach of statutory and/or legal fiduciary duties arising under R.C. 1311.14.

{¶ 21} The Lenders moved for summary judgment on all of Braun's and Eramo's claims. Braun and Eramo opposed that motion. In a judgment dated June 6, 2019, the trial court granted the Lenders' motion.

{¶ 22} Braun and Eramo now appeal the June 6, 2019 judgment, and they assign the following errors:

> I. THE TRIAL COURT ERRED WHEN IT GRANTED SUMMARY JUDGMENT IN FAVOR OF THE LENDERS ON BRAUN AND ERAMO'S CLAIMS FOR CONSTRUCTIVE FRAUD.
>
> II. THE TRIAL COURT ERRED WHEN IT GRANTED SUMMARY JUDGMENT IN FAVOR OF THE LENDERS ON BRAUN'S CLAIM FOR TORTIOUS INTERFERENCE WITH A CONTRACT.
>
> III. THE TRIAL COURT ERRED WHEN IT GRANTED SUMMARY JUDGMENT IN FAVOR OF THE LENDERS ON BRAUN'S CLAIM FOR BREACH OF STATUTORY AND/OR LEGAL FIDICIARY DUTIES ARISING UNDER R.C. 1311.14.
>
> IV. THE TRIAL COURT ERRED WHEN IT GRANTED SUMMARY JUDGMENT IN FAVOR OF THE LENDERS ON BRAUN AND ERAMO'S CLAIMS FOR BREACH OF [THE] CONSTRUCTION LOAN AGREEMENT BASED UPON THEIR RIGHTS AS THIRD-PARTY BENEFICIARIES.
>
> V. THE TRIAL COURT ERRED WHEN IT GRANTED SUMMARY JUDGMENT IN FAVOR OF THE LENDERS ON BRAUN AND ERAMO'S CLAIMS BASED UPON PROMISSORY ESTOPPEL.

{¶ 23} A trial court must grant summary judgment under Civ.R. 56 when the moving party demonstrates that: (1) there is no genuine issue of material fact; (2) the moving party is entitled to judgment as a matter of law; and (3) reasonable minds can come to but one conclusion when viewing the evidence most strongly in favor of the nonmoving party, and that conclusion is adverse to the nonmoving party. *Hudson v. Petrosurance, Inc.*, 127 Ohio St.3d 54, 2010-Ohio-4505, ¶ 29; *Sinnott v. Aqua-Chem, Inc.*, 116 Ohio St.3d 158, 2007-

Ohio-5584, ¶ 29. Appellate review of a trial court's ruling on a motion for summary judgment is de novo. *Hudson* at ¶ 29. This means that an appellate court conducts an independent review, without deference to the trial court's determination. *Zurz v. 770 W. Broad AGA, LLC*, 192 Ohio App.3d 521, 2011-Ohio-832, ¶ 5 (10th Dist.); *White v. Westfall*, 183 Ohio App.3d 807, 2009-Ohio-4490, ¶ 6 (10th Dist.).

{¶ 24} The party moving for summary judgment bears the initial burden of informing the trial court of the basis for the motion and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. *Dresher v. Burt*, 75 Ohio St.3d 280, 293 (1996). The moving party does not discharge this initial burden under Civ.R. 56 by simply making conclusory allegations. *Id.* Rather, the moving party must affirmatively demonstrate by affidavit or other evidence allowed by Civ.R. 56(C) that there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *Id.* If the moving party meets its burden, then the nonmoving party has a reciprocal burden to set forth specific facts showing that there is a genuine issue for trial. Civ.R. 56(E); *Dresher* at 293. If the nonmoving party does not so respond, summary judgment, if appropriate, shall be entered against the nonmoving party. *Dresher* at 293.

{¶ 25} By their first assignment of error, Braun and Eramo argue that the trial court erred in granting summary judgment on their claims for constructive fraud. We disagree.

{¶ 26} "Constructive fraud is defined as 'a breach of a legal or equitable duty, which, irrespective of moral guilt of the fraud feasor, the law declares fraudulent, because of its tendency to deceive others, to violate public or private confidence, or to injure public interests.' " *Cohen v. Estate of Cohen*, 23 Ohio St.3d 90, 91 (1986), quoting *Stanley v. Sewell Coal Co.*, 285 S.E.2d 679, 683 (W.Va.1981). "Constructive fraud does not require proof of fraudulent intent; the law indulges in an assumption of fraud for the protection of valuable social interests based upon an enforced concept of confidence both public and private." *Perlberg v. Perlberg*, 18 Ohio St.2d 55, 58 (1969). In other words, a plaintiff need not offer evidence of fraudulent intent to recover for constructive fraud; rather, the law presumes the existence of fraud to protect those rendered vulnerable as a result of investing a special confidence in another, thus placing the trusted party in a position to take unfair advantage. *L&N Partnership v. Lakeside Forest Assn.*, 183 Ohio App.3d, 2009-Ohio-2987, ¶ 49 (10th Dist.); *Woodworth v. Huntington Natl. Bank*, 10th Dist. No. 95APE02-219

(Dec. 7, 1995). Therefore, instead of scienter, a constructive fraud claim requires proof of a confidential or fiduciary relationship between the parties. *Schmitz v. Natl. Collegiate Athletic Assn.*, 8th Dist. No. 103525, 2016-Ohio-8041, ¶ 63; *L&N Partnership* at ¶ 50; *accord Kegg v. Mansfield*, 5th Dist. No. 2000CA00311 (Apr. 30, 2001) ("[I]n order to succeed under a constructive fraud [claim], 'some peculiar confidential relationship' must exist, such as in the form of a fiduciary duty."); *Ohio Univ. Bd. of Trustees v. Smith*, 132 Ohio App.3d 211, 219 (4th Dist.1999) ("In order for constructive fraud to exist, the parties must have 'special confidential or fiduciary relation.' "); *Assn. for Responsible Dev. v. Fieldstone Ltd. Partnership*, 2d Dist. No. 16994 (Nov. 13, 1998) (concluding that the plaintiffs could not prevail on their claim for constructive fraud because they failed to prove the existence of a special or fiduciary relationship between the parties); *Woodworth* ("Constructive fraud requires a confidential relationship.").

{¶ 27} A fiduciary relationship is one " 'in which special confidence and trust is reposed in the integrity and fidelity of another and there is a resulting position of superiority or influence, acquired by virtue of this special trust.' " *Ed Schory & Sons, Inc. v. Soc. Natl. Bank*, 75 Ohio St.3d 433, 442 (1996), quoting *In re Termination of Employment of Pratt*, 40 Ohio St.2d 107, 115 (1974). A confidential relationship arises whenever one person relies on and trusts another in his or her important affairs, whether the relations involved are legal, moral, social, domestic, or personal. *Applegate v. Fund for Constitutional Govt.*, 70 Ohio App.3d 813, 816 (10th Dist.1990). Ordinarily, a business transaction where the parties deal at arm's length does not create a fiduciary or confidential relationship. *Hoyt v. Nationwide Mut. Ins. Co.*, 10th Dist. No. 04AP-941, 2005-Ohio-6367, ¶ 30; *Assn. for Responsible Dev.*

{¶ 28} In the case at bar, the Lenders had scant dealings with Braun and none with Eramo. To the extent the parties interacted, the record contains no evidence that their relationship varied from a typical arm's-length business relationship in which both sides operated to protect their own interests. Braun and Eramo cite no evidence showing that they entrusted the Lenders with important or confidential matters. The record, therefore, does not reflect the existence of any issues of fact with regard to the creation of a confidential or fiduciary relationship between the parties. Absent evidence supporting the creation of such a relationship, the trial court did not err in granting the Lenders summary

judgment on Braun's and Eramo's claims for constructive fraud. Accordingly, we overrule the first assignment of error.

{¶ 29} By the second assignment of error, Braun argues that the trial court erred in granting the Lenders summary judgment on Braun's claim for tortious interference with contracts. We agree.

{¶ 30} To establish a claim for tortious interference with a contract, a plaintiff must prove: (1) the existence of a contract, (2) the defendant's knowledge of the contract, (3) the defendant's intentional procurement of the contract's breach, (4) lack of justification, and (5) resulting damages. *Fred Siegel Co., L.P.A. v. Arter & Hadden*, 85 Ohio St.3d 171 (1999), paragraph one of the syllabus. Here, in their motion for summary judgment, the Lenders focused solely on the fourth element and argued that their actions were justified. To demonstrate the fourth element, the plaintiff must present evidence that the defendant's interference with another's contract was improper. *Id.* at paragraph two of the syllabus. Determination of whether a defendant has acted improperly requires consideration of the factors set forth in Section 767 of the Restatement (Second) of Torts. *Fred Siegel Co.* at 178. Those factors are:

> (a) the nature of the actor's conduct,
>
> (b) the actor's motive,
>
> (c) the interests of the other with which the actor's conduct interferes,
>
> (d) the interests sought to be advanced by the actor,
>
> (e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other,
>
> (f) the proximity or remoteness of the actor's conduct to the interference and
>
> (g) the relations between the parties.

Restatement of the Law 2d, Torts, Section 767 (1979).

{¶ 31} Here, in its counterclaim, Braun alleged that the Lenders knew that Braun and Columbus Campus had entered into agreements for the construction of the first phase of the Hickory Chase project. Braun also alleged that the Lenders knew that Columbus

Campus relied on advances from the Construction Loan Agreement to satisfy its obligations to pay Braun as required by the construction agreements. Braun claimed that the Lenders tortiously interfered with the construction agreements because they improperly and without justification deprived Columbus Campus of loan advances, which caused Columbus Campus to default on its payment obligations under the construction agreements, resulting in damages to Braun.

{¶ 32} In their motion for summary judgment, the Lenders argued that Braun could not recover for tortious interference because Braun could not prove that the Lenders acted improperly. The Lenders contended that they had the authority to cut off funding to Columbus Campus because Section 9.2 of the Construction Loan Agreement stated, "Upon the occurrence of any Event of Default, the obligation of the Lenders to make any further disbursements under the Loan * * * shall terminate." (Ex. 14, Jan. 24, 2011 Stipulations.) In response, Braun asserted that: (1) presuming Events of Default occurred, under the terms of the Construction Loan Agreement, an Event of Default did not discharge the Lenders' obligation to fund the unpaid construction work, (2) presuming Events of Default occurred, questions of fact remained regarding when they occurred, and (3) if the occurrence of Events of Default gave the Lenders the right to stop loan disbursements, the Lenders voluntarily agreed to delay enforcement of that right.

{¶ 33} The trial court found that it had already determined the question of Columbus Campus' default in the Lenders' favor. The court then concluded that "the Lenders' refusal to disburse funds was founded in their contractual right to do so under the [Construction] Loan Agreement." (June 6, 2019 Decision & Entry at 11.) The court further stated the Lenders had no "nefarious motive" in withholding the funds, but only sought to protect their security. *Id.* Finally, the court found that requiring the Lenders to continue to disburse loan proceeds to a defaulting borrower was inconsistent with the requirement to mitigate damages and would most likely have a chilling effect on commercial lending practices. Based on this reasoning, the trial court determined that there was no question of fact that the Lenders' refusal to disburse funds was justified.

{¶ 34} We will first address Braun's argument that the trial court erred in interpreting the Construction Loan Agreement to permit the Lenders to completely stop the disbursement of loan proceeds upon an Event of Default. Braun asserts that, under the

Construction Loan Agreement, an Event of Default allowed the Lenders to terminate loan advances to Columbus Campus, but imposed upon the Lenders an obligation to directly pay Braun for its work. Braun's argument relies on Section 6.2 of the Construction Loan Agreement, which reads, in relevant part:

> Notwithstanding any other provision of this Agreement, the Borrower hereby irrevocably authorizes the Lenders, at the option of the Administrative Agent, after the occurrence of any Default to make disbursements of Loan proceeds (i) directly * * * to any contractor * * * furnishing labor, services, or materials in connection with the Project for any amounts due them in connection therewith * * *.

(Ex. 14, Jan. 24, 2011 Stipulations.)

{¶ 35} We do not construe Section 6.2 as Braun does. Section 6.2 gave KeyBank, as the Administrative Agent, the "option" to directly pay a contractor after a Default. Thus, Section 6.2 permitted, but did not compel, KeyBank to directly pay a contractor. As a discretionary provision, Section 6.2 imposed no duty on KeyBank to fund the unpaid construction work.

{¶ 36} Next, Braun argues that questions of fact remain regarding timing; specifically, when the Event of Default that triggered the Lenders' right to terminate funding occurred. The timing of the Event of Default has significance because if the Lenders withheld loan proceeds prior to the occurrence of an Event of Default, then they cannot claim to have acted with justification. The Lenders do not dispute that, given Columbus Campus' April 9, 2009 draw request, a loan disbursement was due on or about April 20, 2009.[7] Consequently, the issue is whether the evidence establishes without question that an Event of Default occurred prior to April 20, 2009.[8]

---

[7] Section 2.1(b) of the Construction Loan Agreement set forth the borrowing procedure and stated that "[t]he Borrower shall give the Administrative Agent a Notice of Borrowing at least seven (7) Business Days' [sic] prior to a requested Loan advance, setting forth the amount of any proposed borrowing hereunder * * *." (Ex. 14, Jan. 24, 2011 Stipulations.) If the notice was sufficient, KeyBank would make the disbursement.

[8] We reject the Lenders' argument that Braun lacks standing to assert that questions of fact remain regarding whether certain events qualify as Events of Default. The caselaw the Lenders rely on for their standing argument does not support that argument. *See Deutsche Bank Natl. Trust Co. v. Sopp*, 10th Dist. No. 14AP-343, 2016-Ohio-1402, ¶ 19 (finding evidence regarding a mortgagee's noncompliance with a pooling and servicing agreement irrelevant because the mortgagee was the holder of the note, which was endorsed in blank, by virtue of its possession of the note).

{¶ 37} The Lenders rely on the trial court's February 13, 2012 judgment, in which the trial court granted the Lenders summary judgment regarding foreclosure, to establish the occurrence of Events of Default. In the February 13, 2012 judgment, the trial court found that Columbus Campus' failure to pay "the Notes * * * according to their terms and the terms and conditions of the Mortgage, * * * together with the other events alleged, constitute Events of Default as set forth in the [Construction] Loan Agreement." (Feb. 13, 2012 Order at ¶ 13.) The Lenders assert that this factual finding is now the law of the case, and thus excused them from providing evidence regarding the Events of Default. Under the law-of-the-case doctrine, a " 'decision of a reviewing court in a case remains the law of that case on the legal questions involved for all subsequent proceedings in the case at both the trial and reviewing levels.' " *Hopkins v. Dyer*, 104 Ohio St.3d 461, 2004-Ohio-6769, ¶ 15, quoting *Nolan v. Nolan*, 11 Ohio St.3d 1, 3 (1984). The law-of-the-case doctrine may also encompass a trial court's adherence to its own prior rulings under certain circumstances. *Klaus v. Klosterman*, 10th Dist. No. 16AP-273, 2016-Ohio-8349, ¶ 15. Here, assuming the trial court's prior finding is law of the case, that finding is not dispositive because, although the court determined that "other events alleged" were Events of Default, it did not describe what those events were or, more significantly, when those events occurred.

{¶ 38} Consequently, we turn to the actual evidence the Lenders offered to support their motion for summary judgment: the admissions Columbus Campus made in its answer to the Lenders' complaint. An admission in a pleading is equivalent to proof of the fact admitted and, therefore, is evidence that a court may consider in rendering a decision on summary judgment. *BAC Home Loans Servicing, L.P. v. Vanjo*, 11th Dist. No. 2013-L-106, 2015-Ohio-4317, ¶ 24; *Everett v. Cinque*, 10th Dist. No. 99AP-1409 (Aug. 31, 2000). Here, Columbus Campus admitted to the averment contained in the complaint that it "fail[ed] to comply with the requirements of Article IX, Sections 9.1(a), 9.1(e), 9.1(i), 9.1(o), 9.1(t), and 9.1(bb) and [sic] of the [Construction] Loan Agreement." (July 2, 2009 Compl. at ¶ 12, 16, 20, 24, 28, & 32.) By admitting to its failure to comply with these sections, Columbus Campus admitted to engaging in Events of Default. Thus, the Lenders could rely on Columbus Campus' admissions to prove the occurrence of Events of Default. However, the complaint does not describe the circumstances underlying the Events of Default or specify

when those circumstances arose. The admissions, consequently, do not prove how or when the Events of Default occurred.

{¶ 39} The Lenders argue that Columbus Campus' default under Section 9.1(t) implicitly corresponds to Columbus Campus' April payment default on the Windsor loan. Under Section 9.1(t), an Event of Default occurs upon "any default, and expiration of any stated grace or cure period, or the occurrence of any Event of Default (so defined), in connection with any indebtedness of the Borrower, the Guarantor or the Tenant in excess of Two Hundred Fifty Thousand Dollars ($250,000), individually or in the aggregate." (Ex. 14, Jan. 24, 2011 Stipulations.)

{¶ 40} Conceivably, the allegation in the complaint that Columbus Campus defaulted under Section 9.1(t) could have stemmed from Columbus Campus' missed April interest payment on the Windsor loan. At least some evidence, however, conflicts with this conclusion. In internal communications, KeyBank cited Windsor's acceleration of the principal balance—not the failure to timely make the April interest payment—as the Event of Default that arose from the circumstances that developed in early April. (Ex. 13, Kleinhaut Dep.) ("We do however, have a default because the mezz[anine] lender in the Columbus Campus deal has accelerated their entire principal balance."); Ex. 173, Shoop Dep. ("[M]uch of the default rationale was the fact that Windsor sent a letter to ERC which accelerated their debt. The acceleration caused a cross default to our Loan."); Ex. 179, Shoop Dep. (May 5, 2009 email from KeyBank listing Columbus Campus' alleged defaults, which included the "acceleration of the Windsor debt," but not the missed April interest payment.) Not only do the Lenders disregard this evidence, they also ignore evidence that Braun offered to negate the existence of the alleged Event of Default, including evidence that Windsor rescinded and revoked its letter of default and the Event of Default declared therein. The Lenders likewise do not respond to Braun's contention that the Subordination and Standstill Agreement between KeyBank and Windsor prohibited cross default and Windsor's acceleration of the principal without KeyBank's prior written consent. Moreover, the Lenders fail to explain why, if they meant to claim an Event of Default based on a breach of the Windsor loan terms, they did not instead assert a failure to comply with Section 9.1(y), which mirrors the language of Section 9.1(t) but specifically applies to the mezzanine financing. Given these issues, questions of fact remain.

{¶ 41} The Lenders also argue (for the first time) on appeal that the Event of Default under Section 9.1(o) implicitly corresponds with Erickson's looming financial collapse and withdrawal of support for the Hickory Chase project. According to Section 9.1(o), an Event of Default includes "any condition or situation which, in the Administrative Agent's sole judgment, constitutes a material adverse change with respect to the Project, the Borrower, the Guarantor, * * * or the Loan." (Ex. 14, Jan. 24, 2011 Stipulations.)

{¶ 42} We are even less persuaded that the evidence unquestionably supports this connection. By the time Columbus Campus admitted to the Event of Default under Section 9.1(o), all construction had ceased on the Hickory Chase project, which could constitute a material adverse change. Thus, the admission could refer to the May 11, 2009 construction stoppage, and not Erickson's financial condition. Additionally, the Lenders did not raise the existence of a material adverse change until the May 8, 2009 letter, and even then, they did not explain what condition or situation constituted the change. We, therefore, conclude that questions of fact remain regarding what circumstances gave rise to the Section 9.1(o) Event of Default and when those circumstances reached the tipping point.

{¶ 43} In sum, we determine that Columbus Campus admitted that Events of Default occurred under Sections 9.1(t) and 9.1(o) of the Construction Loan Agreement. However, the record does not conclusively disclose what facts precipitated those Events of Default nor when those Events of Default occurred. As those questions remain unresolved, the trial court erred in concluding that the Lenders established their refusal to disburse loan proceeds was justified.

{¶ 44} Finally, Braun argues that the Lenders cannot claim that they properly withheld loan proceeds because, at the time the relevant loan advances were due, the Lenders had agreed to refrain from enforcing their default rights and remedies. In other words, Braun contends that, because the Lenders agreed to postpone the termination of disbursements until July 31, 2009, the Lenders should have made loan advances on April 20, May 20, and June 20. These loan advances would have compensated Braun for the construction work performed on the Hickory Chase project from March 1, 2009 until the stoppage of work on May 11, 2009.

{¶ 45} The resolution to this argument turns on the difference between suspension and termination. As we stated above, Section 9.2 of the Construction Loan Agreement

stated, "[u]pon the occurrence of any Event of Default, the obligation of the Lenders to make any further disbursements under the Loan * * * shall terminate." (Ex. 14, Jan. 24, 2011 Stipulations.) Nevertheless, in the April 21, 2009 letter, the Lenders *suspended* further disbursements due to the "apparent" Event of Default. In the subsequent April 28, 2009 letter, the Lenders declared the Event of Default had actually occurred, but they were not exercising any of their default rights. They could correctly make this statement because they never *terminated* the loan advancements—they had just suspended them. By this maneuver, the withholding of loan proceeds did not run afoul of the forbearance agreements. Thus, neither the April 28, 2009 letter nor the terms of the forbearance agreements rendered the Lenders' actions improper.

{¶ 46} After considering each of Braun's arguments, we conclude that questions of fact relevant to the issue of justification preclude summary judgment on the claim for tortious interference with contracts. The trial court, therefore, erred in granting the Lenders summary judgment on that claim. Accordingly, we sustain the second assignment of error.

{¶ 47} By its third assignment of error, Braun argues that the trial court erred in granting summary judgment to the Lenders on Braun's claim for breach of statutory and/or legal fiduciary duties arising under R.C. 1311.14. We disagree.

{¶ 48} Generally, construction mortgages, as defined in R.C. 1311.14, have priority over valid mechanics' liens. *In re Qualstan Corp.*, 310 B.R. 833, 840 (Bankr.S.D.Ohio 2004). However, to obtain that priority, a mortgagee must distribute the proceeds of the construction loan in the order specified in R.C. 1311.14(B)(1) through (7). *Id.* at 842; *accord Wayne Bldg. & Loan Co. v. Yarborough*, 11 Ohio St.2d 195, 209 (1967) ("Section 1311.14, Revised Code, specifically allows priority to a construction mortgage for future advances over mechanics' liens * * * if * * * the disbursement of mortgage funds satisfies such section.").

{¶ 49} Braun interprets R.C. 1311.14(B) to impose a duty on a mortgagee to disburse the entirety of a construction mortgage fund. To support this interpretation, Braun relies on *Knollman Lumber Co. v. Hillenbrand*, 64 Ohio App. 549 (1st Dist.1940). That case involved a controversy between homeowners, a mortgagee, and multiple material suppliers, arising out of the construction of a residence. After determining lien priority

under the General Code predecessor to R.C. 1311.14, the appellate court turned to housekeeping matters. The appellate court noted that the mortgagee had not distributed all the money the homeowner had borrowed under the construction loan, and it ordered that money disbursed to the unpaid claimants. The court did not cite any authority for its action. Apparently, the court required the pay out because the mortgagee had a contractual duty—not any statutory duty—to pay the full amount borrowed. The mortgagee owed that contractual duty because, unlike here, it appears the borrowers had not defaulted on the construction loan. Because the *Hillenbrand* court's order hinged on the existence of a contractual duty, we do not interpret *Hillenbrand* to create any duty under R.C. 1311.14 to disburse undistributed mortgage funds.

{¶ 50} Moreover, the plain language of R.C. 1311.14(B) does not support Braun's interpretation. That section provides that, "the mortgagee shall, in order to obtain the priority set forth in this section, distribute the mortgage fund" in the order set forth in R.C. 1311.14(B)(1) through (7). R.C. 1311.14(B). If "the mortgagee pays out the fund otherwise than as provided in [R.C. 1311.14(B)(1) through (7)], then the lien of the mortgage to the extent that the funds had been otherwise paid, is subsequent to liens of original contractors, subcontractors, material suppliers, and laborers." *Id.* Thus, rather than impose a duty, R.C. 1311.14(B) gives the mortgagee an option: comply and receive priority; deviate and fall into a subordinate position. Accordingly, we overrule Braun's third assignment of error.

{¶ 51} By their fourth assignment of error, Braun and Eramo argue that the trial court erred in granting summary judgment to the Lenders on Braun's and Eramo's claims for breach of the Construction Loan Agreement. We disagree.

{¶ 52} "Only a party to a contract or an intended third-party beneficiary of a contract may bring an action on a contract in Ohio." *Grant Thorton v. Windsor House, Inc.*, 57 Ohio St.3d 158, 161 (1991). Here, neither Braun nor Eramo is a party to the Construction Loan Agreement, but both claim to be intended third-party beneficiaries to that contract. On that basis, Braun and Eramo assert that they have the ability to bring a claim for breach of the Construction Loan Agreement against the Lenders.

{¶ 53} To determine whether a party is an intended third-party beneficiary, Ohio courts apply Section 302 of the Restatement (Second) of Contracts, which reads:

> (1) Unless otherwise agreed between promisor and promisee, a beneficiary of a promise is an intended beneficiary if

recognition of a right to performance in the beneficiary is appropriate to effectuate the intention of the parties and either

(a) the performance of the promise will satisfy an obligation of the promisee to pay money to the beneficiary; or

(b) the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance.

(2) An incidental beneficiary is a beneficiary who is not an intended beneficiary.

Restatement of the Law 2d, Contracts, Section 302 (1981). *See Hill v. Sonitrol of Southwestern Ohio, Inc.*, 36 Ohio St.3d 36, 40 (1988) (adopting Section 302). Under Section 302(1)(b), for a third party to acquire intended beneficiary status, it must present evidence that the promisee intended to directly benefit the third party. *Huff v. FirstEnergy Corp.*, 130 Ohio St.3d 196, 2011-Ohio-5083, ¶ 11; *Hill* at 40. A third party who receives a mere happenstance benefit from the performance of a contract is only an incidental beneficiary. *Hill* at 40.

{¶ 54} As evidence that the Lenders intended to directly benefit them, Braun and Eramo point to Section 2.1(a) of the Construction Loan Agreement. Section 2.1(a) states in relevant part, "Loan proceeds shall be advanced (or reserved) for the following purposes: (i) for the construction of the Project Improvements[.]" (Ex. 14, Jan. 24, 2011 Stipulations.) This section, however, does not establish an intent to directly benefit Braun or Eramo. The purpose of the loan was to directly benefit Columbus Campus by providing it with the funding necessary to pay for the construction of the Hickory Chase project. Because Braun and Eramo worked as general contractor and a subcontractor on the Hickory Chase project, they received an incidental benefit in the form of payment for their services. This incidental benefit, however, does not transform them into intended third-party beneficiaries.

{¶ 55} At least three Ohio cases have reached the same holding in like circumstances. *Skaff v. Khutorsky*, 6th Dist. No. L-15-1249, 2016-Ohio-4903, ¶ 20; *Huntington Natl. Bank v. Val Homes, Inc.*, 11th Dist. No. 2011-G-3021, 2012-Ohio-526, ¶ 42; *Bain Builders v. Huntington Natl. Bank*, 8th Dist. No. 78442 (July 5, 2001). In each of these cases, a contractor or subcontractor claimed it was an intended third-party

beneficiary to a construction loan agreement between a lender and a borrower. In each case, the court rejected the contractor's or subcontractor's argument, reasoning as we did above.

{¶ 56} In arguing to the contrary, Braun and Eramo contend that Columbus Campus intended to give the contractors the loan proceeds (i.e., the benefit of the promised performance under the Construction Loan Agreement), so the contractors were third-party intended beneficiaries pursuant to Section 302(1)(b). We are not persuaded.

{¶ 57} Section 302(1)(b) recognizes the creation of a third-party intended beneficiary as a result of a "[g]ift promise," which occurs when "the promised performance is not paid for by the recipient, discharges no right he has against anyone, and is apparently designed to benefit him." Restatement of the Law 2d, Contracts, Section 302, Comment c (1981). However, here, Columbus Campus never intended to give anything to Braun or the subcontractors when it executed the Construction Loan Agreement. Columbus Campus used the loan proceeds it received to discharge Braun's right to payment under the construction contracts governing the first phase of the Hickory Chase project. In other words, the loan proceeds constituted compensation—not a gift—to Braun. Without evidence that Columbus Campus intended to give the contractors the loan proceeds, Braun and Eramo cannot establish themselves as third-party intended beneficiaries under Section 302(1)(b).

{¶ 58} In sum, we conclude that the record contains no evidence from which reasonable minds could find that Braun and Eramo were intended third-party beneficiaries. Braun and Eramo, therefore, lack the ability to sue for breach of the Construction Loan Agreement. Accordingly, we overrule the fourth assignment of error.

{¶ 59} By the fifth assignment of error, Braun and Eramo argue that the trial court erred in granting the Lenders summary judgment on Braun's and Eramo's claims for promissory estoppel. We disagree.

{¶ 60} Promissory estoppel is an equitable doctrine that comes into play when the requisites of contract are not met, yet a promise should be enforced to avoid injustice. *Olympic Holding Co., L.L.C. v. Ace Ltd.*, 122 Ohio St.3d 89, 2009-Ohio-2057, ¶ 39-40. " 'Promissory estoppel is inconsistent with the existence of an express written contract.' " *Kashif v. Cent. State Univ.*, 133 Ohio App.3d 678, 684 (10th Dist.1999), quoting *Warren v.*

*Trotwood-Madison School Dist. Bd. of Edn.*, 2d Dist. No. 17457 (Mar. 19, 1999). Consequently, a plaintiff cannot recover for promissory estoppel where the promise forming the basis of that claim is contained within an express written contract. *Right-Now Recycling, Inc. v. Ford Motor Credit Co., LLC*, 644 Fed.Appx. 554, 558 (6th Cir.2016); *Americana Invest. Co. v. Natl. Contracting & Fixturing, LLC*, 10th Dist. No. 15AP-1010, 2016-Ohio-7067, ¶ 13-14; *TLC Health Care Servs., LLC v. Enhanced Billing Servs., L.L.C.*, 6th Dist. No. L-08-1121, 2008-Ohio-4285, ¶ 24.

{¶ 61} Here, Braun and Eramo based their promissory estoppel claims on "the Lenders' representations * * * that KeyBank was administering a $90 Million [sic] construction loan to fund the $40 Million [sic] of construction." (Appellant's Brief at 73.) The representation that KeyBank was administering a $90 million loan is a fact, not a promise. That fact, of course, resulted from the Lenders' promise, contained in the Construction Loan Agreement, to provide Columbus Campus a revolving loan, in an amount not to exceed $90 million. Because the Lenders' made their promise in a contract, Braun and Eramo cannot pursue a promissory estoppel claim for reliance on that promise. *See Shane v. Bunzl Distrib. USA, Inc.*, 200 Fed.Appx. 397, 404 (6th Cir.2006), quoting *Heating & Air Specialists, Inc. v. Jones*, 180 F.3d 923, 934 (8th Cir.1999) (holding "it is a 'widely accepted principle that promissory estoppel is applicable only in the absence of an otherwise enforceable contract' "); *Manno v. St. Felicitas Elementary School*, 161 Ohio App.3d 715, 2005-Ohio-3132, ¶ 31 (8th Dist.) ("[T]he existence of a written contract barred [the plaintiff] from maintaining a promissory-estoppel claim."); *see also Zollinger v. Carrol*, 137 Idaho 397, 400 (2002) (holding that, where the parties to an agreement had exchanged mutual promises, there was no failure of consideration such that promissory estoppel could apply, thus defeating the promissory-estoppel claim of a non-party to the agreement). Accordingly, we overrule the fifth assignment of error.

{¶ 62} Finally, because we have sustained the second assignment of error, we must address the Lenders' alternative argument for affirming the grant of summary judgment in their favor. We have concluded that the existence of questions of fact precludes summary judgment on Braun's claim for tortious interference with contracts. The Lenders, however, assert that that claim is barred by the law-of-the-case doctrine.

**{¶ 63}** As we stated above, under the law-of-the-case doctrine, a " 'decision of a reviewing court in a case remains the law of that case on the legal questions involved for all subsequent proceedings in the case at both the trial and reviewing levels.' " *Hopkins*, 104 Ohio St.3d 461, 2004-Ohio-6769, at ¶ 15, quoting *Nolan v. Nolan*, 11 Ohio St.3d 1, 3 (1984). This doctrine prevents a party from raising arguments that "were fully pursued, or available to be pursued, in a first appeal." *Hubbard v. Sauline*, 74 Ohio St.3d 402, 404-05 (1996).

**{¶ 64}** Here, the Lenders contend that law of the case appears in our decision affirming the trial court's ruling that the Lenders' construction mortgage had priority over the subcontractors' mechanics' liens. In the course of that decision, we concluded that the trial court did not err in declining to apply a constructive trust on the undistributed portion of the mortgage loan so the subcontractors could receive payment. *KeyBank NA*, 2013-Ohio-1243, at ¶ 64. The Lenders now assert that our rejection of this equitable theory of recovery precludes Braun from pursuing its claim for tortious interference. We are not persuaded. First, we did not decide any legal issue in the first appeal that arises again in this appeal. Second, Braun did not participate in the first appeal, so it did not have the opportunity to pursue any argument in that appeal. Accordingly, the law-of-the-case doctrine does not entitle the Lenders to summary judgment on Braun's claim for tortious interference with contracts.

**{¶ 65}** For the foregoing reasons, we sustain the second assignment of error, and we overrule the first, third, fourth, and fifth assignments of error. We affirm in part and reverse in part the judgment of the Franklin County Court of Common Pleas, and we remand this cause to that court for further proceedings consistent with law and this decision.

*Judgment affirmed in part; reversed in part;*
*cause remanded.*

SADLER, P.J., and BRUNNER, J., concur.